### SIMONSON v. TYPER.

(Circuit Court of Appeals, Eighth Circuit. December 4, 1922.)

No. 5939.

1. **Process ☞31, 109—Service outside the state held defective and illegal; summons held not to properly describe parties.**

Under Comp. St. Wyo. 1920, §§ 5623, 5627, 5636, 5638, 5641, service outside the state *held* defective and insufficient, where no affidavit showing service could not be made within the state was filed, the summons was directed to a sheriff in another state and served by him without appointment by the sheriff of the county in which the suit was brought, and the summons contained the statement that the defendant had been sued by J., when in fact he was only named as defendant in a cross-bill by another party.

2. **Process ☞53—Only sheriff of county held authorized to appoint another to serve summons.**

Under Comp. St. Wyo. 1920, § 5627, providing that the summons shall be served by the officer to whom directed, or by any person appointed by such officer, only the sheriff of the county in which a suit was brought had the power of appointment.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Process** ⊗➡109—**Affidavit showing service cannot be made within state is a prerequisite to service outside of the state.**

Under Comp. St. Wyo. 1920, § 5641, relative to personal service outside the state, an affidavit must be filed showing that service of summons cannot be made within the state.

4. **Attorney and client** ⊗➡72—**Record only prima facie evidence of authority.**

The record of an action was only prima facie evidence of the authority of an attorney to appear therein for a party for whom he purported to appear.

5. **Attorney and client** ⊗➡72—**Finding that party never authorized appearance held warranted.**

A finding that a mortgagee never authorized his appearance in a suit to foreclose other mortgages, in which he was adjudged to have no right, title, or interest, *held* warranted by the testimony.

6. **Mortgages** ⊗➡319(3)—**Evidence held insufficient to prove release.**

Testimony showing only that a witness saw a paper purporting to be a release of a mortgage and signed with the mortgagee's name, and at the same time saw other papers having the same signature, was insufficient to prove the release, where she never saw the mortgagee sign his name, and only claimed familiarity with his handwriting because of such papers.

7. **Evidence** ⊗➡564(1)—**Witness could not testify to similarity of genuine signature and disputed signature to instrument which could not be produced.**

Under Act Cong. Feb. 26, 1913 (Comp. St. § 1471), providing that any admitted or proved handwriting of a person shall be competent evidence as a basis for comparison, a witness who had seen the signature to an alleged release of a mortgage, which could not be produced, could not testify that a signature written by the mortgagee while on the stand was similar to that signed to the release.

8. **Evidence** ⊗➡573—**Testimony as to resemblance to genuine signature and signature to lost instrument would have been overcome by positive denial of signing.**

Testimony of a witness, who had seen the signature to a lost instrument, that it resembled the signature written by plaintiff while on the stand, if admitted, would have been but an inference, and would have been overcome by plaintiff's positive testimony that he never signed such instrument.

Appeal from the District Court of the United States for the District of Wyoming; John A. Riner, Judge.

Suit by William Typer against Chauncey B. Typer and others. From a decree for plaintiff, defendant Lee Simonson appeals. Affirmed.

Roderick N. Matson, of Cheyenne, Wyo. (Clarence A. Swainson, of Cheyenne, Wyo., on the brief), for appellant.

H. C. Brome, of Omaha, Neb. (Thomas M. Hyde, of Basin, Wyo., on the brief), for appellee.

Before LEWIS and KENYON, Circuit Judges, and YOUMANS, District Judge.

YOUMANS, District Judge. This is an appeal from a decree against Chauncey B. Typer, Clifford W. Axtell, John Z. Jones, and Lee Simonson foreclosing a mortgage given by Chauncey B. Typer to William Typer to secure an indebtedness of $5,000 upon certain lands

⊗➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

in Hot Springs county, Wyo. William Typer was and had been at all times mentioned herein a citizen and resident of Ogle county, Ill., and the defendants were residents of Wyoming. The complaint alleged that the defendants Clifford W. Axtell, John Z. Jones, and Lee Simonson claimed some interest in the real estate described in the mortgage, but that such interest or claim was inferior and subject to the lien of appellee's mortgage. The appellant, Lee Simonson, answered, setting up two defenses, which he now claims were sustained by the evidence. The adverse decision of the court below as to these two defenses is assigned here as error. The first defense was that William Typer was made defendant in a suit in the district court of the Fifth judicial district in and for the county of Hot Springs, in the state of Wyoming, and that he in that suit was adjudged to have no right, title, interest, or equity in the real estate involved in that suit, which was the same real estate described in appellee's mortgage. This defense was based upon two propositions: (a) That in the suit in the state court referred to William Typer was served with summons outside the state of Wyoming, and that judgment by default was taken against him; and (b) that William Typer entered his appearance in the suit in the state court, and that after entering such appearance judgment by default was taken against him. The second defense was that William Typer had, prior to the time that Simonson obtained title to the real estate, released the mortgage he was then seeking to foreclose in the United States District Court. Simonson obtained title to the property through the judicial sale in the proceedings in the state court.

The record of the proceedings in that court were introduced in evidence. That record disclosed that a suit was brought in that court by John Z. Jones against Chauncey B. Typer to foreclose a mortgage upon the land involved in the suit in the court below. C. W. Axtell, who is the same as Clifford W. Axtell, was made a party defendant. Axtell was the attorney of Jones in bringing the suit. Axtell, acting as attorney for himself, filed an answer and cross-bill. William Typer and Frances B. Beldon were made defendants in the cross-bill. There was no allegation in the answer and cross-bill that William Typer was a nonresident of the state of Wyoming. The cross-bill sought foreclosure of a mortgage executed by Chauncey B. Typer to C. W. Axtell to secure an indebtedness of $15,000, and in addition thereto Axtell sought a judgment for $3,000 as an attorney's fee to himself, alleging that such fee was provided for in the mortgage. Axtell delivered to the clerk of the state court a præcipe for summons which reads as follows:

"To the Clerk of Said Court:

"Issue summons in said case, directed to the sheriff of said county, and to Ogle county, Illinois, returnable according to law, indorsed: Foreclosure of mortgage, equitable relief and judgment in the sum of $18,000, with interest at 8 per cent. per annum from October 9, 1918.

"C. W. Axtell, Attorney for Defendant."

A summons was issued to the sheriff of Hot Springs county, Wyo., for Chauncey B. Typer, C. W. Axtell, William Typer, and Frances B. Beldon. The following summons was also issued by the clerk:

"The State of Wyoming, County of Hot Springs—ss.:

"Summons.

"To the Sheriff of Ogle County, State of Illinois—Greeting:

"You are commanded to notify Chauncey B. Typer, C. W. Axtell, William Typer, and Frances B. Beldon that they have been sued in the district court of the Fifth judicial district of the state of Wyoming, sitting in the town of Thermopolis, within and for the county of Hot Springs, in the state of Wyoming, for the trial of causes arising under the laws of said state, by John Z. Jones, and that unless they answer the petition of the plaintiff herein filed on or before the 18th day of January A. D. 1919, said petition, with all the matters and allegations therein contained, will be taken as true, and judgment rendered accordingly. And make due return of this writ, according to law, on the 30th day of December A. D. 1918.

"Witness: Wilbur A. Woodrow, clerk of said court, and the seal thereof, at Thermopolis, Wyoming, this 21st day of December A. D. 1918.
"Wilbur A. Woodrow, Clerk of District Court."

On the back of this summons there appeared the following indorsement:

"In District Court Fifth Judicial District.

"John Z. Jones v. Chauncey B. Typer, C. W. Axtell, William Typer, and Frances B. Beldon. Summons. A Civil Action for the recovery of Money Only.

"The plaintiff will take judgment for the sum of $———, together with interest thereon at the rate of ——— per cent. per annum, from the ——— day of ———, A. D. 19—, and costs of suit, if the defendant fail to answer.

"Issued December 21, 1918.

"Filed January 2, 1919.

"Wilbur A. Woodrow, Clerk of the District Court,
"Lena A. Butler, Deputy Clerk."

There also appeared the following with reference to service:

"The State of Illinois, County of Ogle—ss.:

"I hereby certify that I received the within summons on the 25th day of December, A. D. 1918, at 10 o'clock a. m., and I served the same by delivering a certified copy thereof, together with all the indorsements thereon, together with a copy of the answer and cross-petition of C. W. Axtell in said cause, to William Typer, the within name defendant, at Polo, Ogle county, Illinois, on the 26th day of December A. D. 1918.
"George D. Banning, Sheriff,
"By Sheridan N. Dobson, Deputy Sheriff.

"Subscribed and sworn to before me this 28th day of December, 1918.
"Millard F. Funk, Notary Public.

"My commission expires the 26th day of March, 1922.
"George D. Banning, Sheriff Said County.
"Sheridan N. Dodson, Deputy Sheriff."

Section 5623, Compiled Statutes of Wyoming for 1920, is as follows:

"Requisites of Summons—To Whom Directed. The summons shall be issued by the clerk, shall be under the seal of the court, from which it is issued, and shall be signed by the clerk. Its style shall be: 'The State of Wyoming, ——— County,' and it shall be dated the day it is issued. It shall be directed to the sheriff of the county, and command him to notify the defendant, or defendants, named therein, that he or they have been sued, and must answer the petition filed by the plaintiff (giving his name) at the time stated therein, or the petition will be taken as true, and judgment rendered accordingly, and when the action is for the recovery of money only, there shall be indorsed on the writ the amount to be specified in the præcipe, for which,

with interest, judgment will be taken if the defendant fail to answer. If defendant fail to appear judgment shall not be rendered for a larger amount and the costs."

Section 5627, Compiled Statutes of Wyoming for 1920, reads as follows:

"Who May Serve Summons—Special Appointment. The summons shall be served by the officer to whom it is directed, who shall indorse on the original writ the time and manner of service, or it may be served by any person not a party to the action, appointed by such officer; but the authority of such person shall be indorsed on the writ; and when the writ is served by a person appointed by the officer to whom it is directed, *or when the service is made out of the state, the return shall be verified by oath.* * * * And when such writ, order, process or notice is served by a person so appointed, to whom it is directed, *or when the service is made out of this state, the return shall be verified on an oath or affidavit.* * * *" (Italics ours.)

Section 5636, Compiled Statutes of Wyoming for 1920, reads as follows:

"Service by Publication. Service by publication may be had in either of the following cases: * * * 4. In actions which relate to, or the subject of which is real or personal property in this state, when a defendant has or claims a lien thereon, or an actual or contingent interest therein, or the relief demanded consists wholly or partly in excluding him from any interest therein, and such defendant is a non-resident of the state, or a foreign corporation, or his place of residence cannot be ascertained. * * *"

Section 5638, Compiled Statutes of Wyoming for 1920, reads as follows:

"Affidavit for Service by Publication. Before service by publication can be made, an affidavit of the party, his agent or attorney, must be filed showing that service of a summons cannot be made within this state, on the defendant to be served by publication, and that the case is one of those mentioned in section 5636; and when such affidavit is filed, the party may proceed to make service by publication."

Section 5641, Compiled Statutes of Wyoming for 1920, reads as follows:

"Personal Service Out of State. In all cases where service may be made by publication under the provisions of this chapter, personal service of a copy of the summons and the petition in said action may be made out of the state, and such summons when issued for service out of the state, shall be returnable at the option of the party having it issued, on the second, third or fourth Monday after its date, and shall require the defendant or defendants named therein to answer the petition in said action on or before the third Saturday after the return day named in said summons."

No affidavit was filed in the case in the state court showing that service of summons could not be made upon William Typer within the state of Wyoming. No statute of the state of Wyoming has been brought to our attention in which the clerk of a district court in Wyoming is authorized to issue a summons directed to the sheriff of a county in another state.

[1-3] The contention of appellant is that the record in the state court showed legal service upon William Typer in Illinois. Assuming that the summons above quoted was served as stated in the return of the sheriff of Ogle county, we find the following defects:

(1) An unauthorized issuance of summons by the clerk of the state court to the sheriff of Ogle county, Ill.

(2) The statement in the summons commanding the sheriff of Ogle county, Ill., to notify William Typer that he had been sued in the state of Wyoming by John Z. Jones, which statement was untrue and contrary to the requirement of section 5623 above quoted. No suit against Typer had been brought by John Z. Jones.

(3) Under section 5627 above quoted, the summons, when not served by the officer to whom it is directed, must be served by some one appointed by him. The sheriff of Hot Springs county, Wyo., alone had the power of appointment.

(4) To authorize service outside the state an affidavit must be filed showing that service of summons cannot be made within the state. First State Bank of Addington v. Lattimer, 48 Okl. 104, 149 Pac. 1099.

We hold, therefore, that there was no legal service of summons upon William Typer in the case in the state court.

With reference to the alleged appearance of William Typer in the state court, N. I. Noble, an attorney, testified that he was employed by Chauncey B. Typer in the case in the state court. Noble also testified that Chauncey B. Typer and Harry Typer came to see him, and that he was authorized by Harry Typer to appear for William Typer in the case in the state court. Noble also testified that he, on behalf of William Typer, filed a demurrer to the cross-bill of Axtell. The demurrer was sustained. Axtell then filed an amended cross-bill. Noble at the time was county attorney. He stated that Chauncey B. Typer became involved in a personal difficulty and Noble prosecuted him in the state court. On account of that prosecution Noble stated that he withdrew from the civil case. The record in the state court shows that the demurrer of William Typer was signed by Linn I. Noble and H. C. Chappel, as attorneys for William Typer. Noble on his own motion signed the name of Chappel. Noble testified that at the time he withdrew from the case he filed answers that were signed by Chappel. No answers appear in the record of proceedings in the state court, other than the answer of Axtell. They are not referred to in the decree.

William Typer, the appellee, testified in the court below that he lived at Polo, Ill.; that he did not authorize his brother, Harry Typer, to employ an attorney for him in the case pending in the state court; that he did not know N. I. Noble; that his brother, Harry Typer, living in the town of Polo, Ill., attended to his legal business; that his papers were kept in his brother's safe; that he never authorized him to take the note and mortgage given by Chauncey B. Typer to Thermopolis, Wyo., and deliver them to Mr. Noble.

[4, 5] The court found in favor of William Typer and against Lee Simonson on all the issues joined. Therefore the court found that there was no authorized appearance by William Typer. The record was only prima facie evidence of authority. Blyth v. Swenson, 15 Utah, 345, 49 Pac. 1027. The trial court heard the testimony of Noble and William Typer. We cannot say that its finding to the effect that

William Typer had never authorized his appearance in the case was not warranted by the testimony.

The appellant sought to establish his defense of the execution of a release by William Typer to the mortgage given by Chauncey B. Typer, by the testimony of Mrs. Clara R. Menger. She testified that she was an abstracter; that she lived at Thermopolis, Wyoming; that Chauncey B. Typer and Mr. Axtell, while she was acting as deputy county clerk, came to the courthouse; and that Mr. Chauncey B. Typer gave to her a bunch of papers, and that she drew up a mortgage from Chauncey B. Typer to Axtell. She also testified that about a month later Mr. Chauncey Typer brought a release to the abstract office. Her testimony then was as follows:

"Q. What release, Mrs. Menger? A. The release of mortgage from William Typer to Chauncey Typer. He brought it there for me to have recorded and extend the abstracts.

"Q. And this was the mortgage on this particular land in controversy? A. Yes, sir.

"Q. What was done? A. He said that—

"Mr. Brome: We object to what was said.

"The Court: What happened? We do not want the conversation. What did you do? A. I did not do anything.

"Q. What did Mr. Typer do them? A. He took the release out of my office to take to the courthouse to record.

"Q. Did you see the release? A. I did.

"Q. Are you familiar with the handwriting of William Typer? A. I am. I was at that time.

"Q. How did you become familiar with it? A. Because of the papers which Mr. Chauncey Typer had given me. Mr. William Typer had a letter and one or two papers in there.

"Q. State whether or not you would say that the signature on the release of the mortgage, which you saw, was the genuine signature of William Typer."

This question was objected to by counsel for appellee "as incompetent, irrelevant, and immaterial, and no proper foundation laid, and no showing of any effort made to obtain the original paper or ascertain its whereabouts." This objection was sustained by the court. Counsel for appellant then undertook to obtain from the witness a statement as to what was said by Chauncey Typer. Upon objection this was excluded. The witness also stated that she never saw William Typer that she remembered of, and that she never saw him sign his name. It appears from the foregoing that she based her claim of familiarity with the handwriting of William Typer upon the papers which Chauncey B. Typer had given her. She did not claim to have had any correspondence with William Typer.

[6] It is contended by counsel for the appellant that the evidence was sufficient to prove that the mortgage sought to be foreclosed had been released by the plaintiff prior to the commencement of this suit. The most that could be said for the testimony of this witness, up to this point, was that she saw a paper purporting to be a release signed by the name "William Typer." At the same time she saw other papers having the same signature. The trial court ruled in effect that this testimony had no probative force with reference to the genuine signature of William Typer, because the witness had not qualified her-

self to give an opinion with reference to the genuine signature of William Typer.

[7] Afterwards William Typer was called to the stand by counsel for Simonson and was asked to write his name on a piece of paper. He did so and this paper was marked Exhibit No. 1. Mrs. Menger was then recalled for further examination, and was interrogated by counsel for Simonson as follows:

"Q. I hand you Defendant's Exhibit No. 1, and now ask you to state, Mrs. Menger, whether or not the signature which you saw on a purported release of this particular mortgage in controversy, is the same signature which is on Exhibit No. 1.

"Mr. Brome: That is objected to as being incompetent, irrelevant and immaterial. The competency of the witness is not shown. (Sustained. Exception by defense.)

"The Court: You have not shown, in the first place, she is qualified to testify as an expert, and, in the second place, as to the release.

"Mr. Kennedy: We have never been able, and never will be able, to produce the other paper.

"The Court: So far as the evidence goes, it never existed.

"Mr. Kennedy: We desire an exception to the ruling of the court, and desire to have the paper made a part of the record."

Counsel for appellant, in thus securing the signature of William Typer, sought to bring the case within the rule of evidence which permits the introduction of testimony as to the genuineness of a signature by what is termed "comparison of hands." Testimony of the genuineness of handwriting by comparison was authorized in the federal courts by the Act of Congress approved February 26, 1913 (section 1471, United States Compiled Statutes). That act reads as follows:

"In any proceeding before a court or judicial officer of the United States where the genuineness of the handwriting of any person may be involved, any admitted or proved handwriting of such person shall be competent evidence as a basis for comparison by witnesses, or by the jury, court, or officer conducting such proceeding, to prove or disprove such genuineness."

In this instance it was stated by counsel for appellant that the document, the authenticity of which was in question, could not be produced for comparison. For the purposes of this discussion it will be conceded that the witness, if permitted to testify, would have said that the signature of William Typer as written by him on the witness stand was similar to the signature that the witness saw on the document which purported to be a release. The following quotations are taken from volume 3 of Chamberlayne on the Modern Law of Evidence. Section 2203 is as follows:

"Even from a standpoint of technical procedure, as established later, it was not absolutely necessary that a witness as to the genuineness of handwriting should ever have seen the person in question actually write. By another procedural qualification, one more nearly adapted to the necessities of an increasing commerce, the mental standard from resemblance to which inferences as to genuineness might properly be drawn, could be created in the mind of an ordinary observer. The witness was, as he still is, permitted to testify if he had ever received letters or other writings purporting to be the work of the person in question in the course of business or social correspondence. Simply receiving writings, however, which purport to come from A., by no means es-

tablishes the proposition that the latter wrote them. A further element of qualification is needed. To this point proof of competency necessarily addressed itself. After its own fashion, technical procedure demanded certain formal requirements. The standardizing documents, the writings which have created in the witness a mental standard from which he testifies, must have been received by the witness in the regular course of correspondence from A., the alleged writer. Nor is this all. It must be affirmatively made to appear, by evidence dehors, outside of, the documents themselves that the genuineness of the writing as that of A. should have been acted upon by the witness in connection with such regular course. A final qualification must be added. A., being made aware, in some substantial way, of this latter circumstance, must be proved to have consented to, approved of, and, so to speak, acquiesced in, the action of the witness in assuming the writing to be A.'s. In this way, the danger of collateral issues, at all times a serious administrative peril in dealing with so easily distracted a body as the jury, was thought to be obviated, or at least minimized."

In this instance the witness had received no communications from William Typer. He had in no way acknowledged the genuineness of any handwriting purporting to be his. He had never acquiesced in the action of the witness in assuming the writing to be his.

In section 2214a, under the subhead of "Comparison of Hands," Chamberlayne says:

"The difficulty which technical procedure experienced in securing to judicial administration the benefit of the skilled observer as to handwriting was obvious. Seldom would it be found to happen that an observer sufficiently skillful in the matter to make his inference helpful to the jury would either have seen the person in question write or have received business communications from him under conditions which would make them available as standardizing documents. It would even be highly improbable that the skilled witness should have acquired from any source an antecedent familiarity with the penmanship of a particular writer. How, then, could the mental standard be properly created in the mind of the trained witness, the so-called 'expert'? One expedient was at hand. The witness could examine specimens of A.'s handwriting proved by others or admitted by him to be genuine. The man of skill in handwriting might then be asked to state whether or not, upon a juxtaposition of the genuine with the disputed writing, or upon a comparison of the latter with the mental standard previously created in the witness' mind by the study of genuine specimens of A.'s handwriting, the controverted document was, in his opinion, actually in A.'s handwriting. This has been known, in comparatively recent times, as 'comparison of hands.' * * * It seems appropriate, however, at this place, to call attention to the fact that the now recognized meaning of the term 'comparison of hands' is much more restricted than it was at a prior period in the evolution of the English law of evidence. As is noticed elsewhere, it was in these earlier times of much broader meaning. It was truly said in a celebrated English case: 'All evidence of handwriting, except where the witness sees the document written, is in its nature comparison. It is the belief which a witness entertains upon comparing the writing in question with an exemplar in his mind derived from some previous knowledge.' From this point of view, the modern 'comparison of hands' would more properly be denominated comparison by juxtaposition."

In the absence of the document, the authenticity of which was sought to be established, rendering a comparison impossible, we think the court was right in excluding the testimony of this witness.

[8] At best her evidence would have been an inference. William Typer, the appellee, afterwards went on the stand and testified that he had never signed a release of this mortgage. This positive statement of fact would overcome the inference of the witness Menger, ar-

rived at under the circumstances stated by her.  We cannot say that the court erred.

The decree, therefore, will be affirmed.  It is so ordered.,